# UNITED STATES DISTRICT COURT

for the

District of Connecticut

<u>New Haven</u> Division

|  |  |
|---|---|
| ) | Case No. |
| ) | *(to be filled in by the Clerk's Office)* |
| **JACKSON TADDEO-WAITE** ) | |
| *Plaintiff(s)* ) | |
| ) | Jury Trial: *(check one)* ☑ Yes ☐ No |
| ) | |
| ) | |
| -v- ) | |
| X Corp., formerly known as Twitter, Inc. ) | MAY 30 2025 PM2:44 |
| & ) | FILED-USDC-CT-NEW_HAVEN |
| X.AI Corp. ) | |
| *Defendant(s)* ) | |
| ) | |
| ) | |

# COMPLAINT FOR A CIVIL CASE

## I. INTRODUCTION

1. This case tests the outer limit of legal immunity in a digital age where speech is no longer merely hosted, but bought, sold, curated, and weaponized.

2. At its core is a single grotesque post—targeting a minor child, using her name, image, and location, and pairing her identity with racist and sexually-explicit language.

3. That post was reported more than ten times. It was never removed.

4. Plaintiff paid for visibility on the service that amplified it.

5. He used his real name and identity to speak out publicly.

6. He reported the abuse, flagged the risk, and followed the company's protocols.

7. The response? Silence. Then denial. Then algorithmic suppression of his speech—while the defamatory post multiplied across accounts.

8. This is not a private grievance. It is a public reckoning.

9.    The entity in question profits from engagement, sells amplification, and hides behind a federal immunity statute originally written to protect neutral hosts—not digital publishers monetizing the placement of written material.

10.    This case is brought not only to redress private harm, but to challenge a dangerous and expanding contradiction in law: wherein corporations claim the power to edit and amplify speech at scale, yet evade liability by calling themselves "platforms."

11.    When a company curates, suppresses, monetizes, and ignores harm—while invoking the authority of federal protection—it does not remain private.

12.    It becomes entwined with public power. And it must be held accountable to the United States Constitution.

13.    Legacy media institutions are criticized, regulated, and held liable for the speech they publish.

14.    They are accountable—to the Constitution, to the courts, and to the public—even when under attack.

15.    By contrast, corporations operating digital services like X Corp. perform identical editorial functions—selecting, ranking, amplifying, and suppressing written and illustrated opinions and thoughts—but claim legal immunity on the basis that they are not publishers.

16.    Section 230 has enabled this contradiction to metastasize.

17.    It has created a speech ecosystem where power is unaccountable, falsehoods are amplified, and truth-tellers are silenced—not by accident, but by nefarious design.

18.    This case is not just about a parent's pain or a child's endangerment—though those harms alone should be healed and amplified by the community to prevent their recurrence.

19.    This case is—unequivocally—about whether our legal system still protects dignity, childhood, and truth in the digital public square.

20. For decades, Section 230 has been interpreted to shield online services from accountability—even as they grew into the most powerful publishers in history.

21. The global trajectory of speech, safety, and democratic order has been shaped—and often distorted—by the unchecked immunity conferred by this statute.[1]

22. Plaintiff seeks redress not only for personal harms, but to force the constitutional question: when speech becomes commerce, and commerce becomes cruelty, where is the line we draw as Americans?

23. If the law refuses to confront this now, it will not be technology that erodes democracy— it will be silence.

24. Given the scope of the constitutional issues presented, Plaintiff respectfully submits that these questions merit not just written adjudication, but argument in open court.[2]

25. This claim does not assert that Defendants merely hosted third-party speech. Rather, it alleges that Defendants, under the protection of federal immunity, exercised monetized editorial power to suppress specific political speech—placing them in a functional role akin to a government censor.[3]

## II. JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States, including but not

---

[1] Cf. *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) (denying Section 230 immunity for failure to warn users about known dangers); see also *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) (suggesting independent duty may arise post-notice).

[2] See Fed. R. Civ. P. 8(a)(2), requiring "a short and plain statement of the claim showing that the pleader is entitled to relief." This complaint balances that requirement with the need to provide fair notice of both factual allegations and the constitutional questions at stake. The factual narrative and legal theories are laid out in full to meet the plausibility standard articulated in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), and to allow the Court and Defendants to engage the merits without delay, obfuscation, or unnecessary motion practice.

[3] **See** *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (holding that private actors may be considered state actors when their functions are "entwined with governmental policies" or when their conduct is "fairly attributable to the State").

limited to the First and Fourteenth Amendments, and federal questions concerning the scope and application of 47 U.S.C. § 230 (the Communications Decency Act), and the constitutional limits of federal immunity when invoked to suppress citizen speech or editorialize content for profit.

27. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

28. Plaintiff is a citizen of Connecticut.

29. Defendant X Corp. is incorporated in Nevada and maintains its principal place of business in Bastrop, Texas.

30. Defendant X.AI Corp. is incorporated in Nevada and headquartered in California. Complete diversity of citizenship exists between the parties.

31. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in the District of Connecticut, where Plaintiff resides and where the harm was suffered.

33. Venue is also proper under 28 S.C. § 1391(c)(2), as each Defendant is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction.

34. This Court has personal jurisdiction over Defendants X Corp. and X.AI Corp. pursuant to Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b, because they regularly conduct business within the State of Connecticut and have purposefully directed tortious conduct into this forum.

35. Each Defendant operates or controls algorithmic content delivery systems accessible to Connecticut residents, monetizes data and attention and makes programmable editorial decisions within this forum, and knowingly caused injury to a Connecticut resident.

36. The exercise of jurisdiction over each Defendant comports with the Due Process Clause of the United States Constitution and satisfies the standards of minimum contacts and purposeful availment, consistent with traditional notions of fair play and substantial justice.

37. Defendant X Corp. is specifically subject to personal jurisdiction in this District because it transacts business across the United States, including in Connecticut, and directs its digital infrastructure, monetization practices, and content curation systems into this forum.

38. As confirmed in judicial filings in Loomer v. Meta Platforms, Inc., No. 3:22-cv-02646-LB (N.D. Cal. Apr. 10, 2023), X Corp. is the legal successor to Twitter, Inc. and has assumed all liabilities, obligations, and operations of that predecessor entity.

39. Its principal place of business is located at 865 FM 1209, Building 2, Bastrop, Texas 78602—making it directly accountable in this forum for the content policies and algorithmic practices that gave rise to this action.

## III. PARTIES

**Plaintiff No. 1**

40. Jackson Taddeo-Waite is a natural-born citizen of the United States, residing in Litchfield County, Connecticut. He is the biological parent and legal guardian of the minor child referenced herein.

41. Plaintiff brings this action pro se under the Constitution and laws of the United States in service of the American commonwealth, not on behalf of his daughter, but to redress

personal harms including coerced silence, loss of access to paid services, and reputational injury caused by Defendants' refusal to enforce their own policies.

**Defendant No. 1**

42.   X Corp. is a Nevada corporation with its principal place of business at 865 FM 1209, Building 2, Bastrop, Texas 78602. X Corp. is the legal successor to Twitter, Inc. and operates the online service X.com (commonly known as "Ex-Twitter"), a digital publishing and algorithmic amplification network.

43.   In Loomer v. Meta Platforms, Inc., No. 3:22-cv-02646-LB (N.D. Cal. Apr. 10, 2023), X Corp. confirmed: "Twitter, Inc. has been merged into X Corp. and no longer exists."

44.   X Corp. may be served via its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201, or in the State of Connecticut pursuant to Conn. Gen. Stat. § 33-929(f), via the Secretary of the State, Business Services Division, 165 Capitol Avenue, Suite 1000, Hartford, CT 06106.

**Defendant No. 2**

45.   X.AI Corp. is a Nevada corporation formed on March 9, 2023, with its principal place of business at 1450 Page Mill Road, Palo Alto, CA 94304. X.AI Corp. is engaged in artificial intelligence development and, as of April 2024, acquired X Corp. through an all-stock transaction.

46.   Elon Musk serves as the Chief Executive Officer, and Jared Birchall is the Chief Financial Officer and Secretary. X.AI Corp. has designated Registered Agent Solutions, Inc. as its agent for service of process in California: Registered Agent Solutions, Inc. 1220 S Street, Suite 150 Sacramento, CA 995811

47.     X.AI Corp. is not registered to do business in the State of Connecticut. Therefore, under Conn. Gen. Stat. § 33-929(f), it may be served in Connecticut via: Secretary of the State – Business Services Division 165 Capitol Avenue, Suite 1000 Hartford, CT 06106.

## IV. STATEMENT OF FACTS

48.     On or about April 8, 2025, an anonymous user published a tweet containing a non-consensual image of Plaintiff's ten-year-old daughter, accompanied by language that was sexually explicit, racially derogatory, and ableist in nature. The tweet was designed to humiliate, dehumanize, and provoke harm to a minor. Plaintiff, a verified user at the time, submitted multiple detailed reports through the service's internal moderation system, and also contacted the @support account via direct message while that account was actively assisting him with a billing inquiry related to his Premium+ subscription.

49.     In response to his initial reports, X Corp. issued a written message stating that the tweet "did not violate our rules" and would remain online. Despite additional follow-ups emphasizing the child's age and the defamatory nature of the post, Plaintiff received no further substantive engagement. Plaintiff made a final public plea by replying directly to the post, requesting its removal and proposing a resolution. The next morning, the defamatory tweet was pinned to the top of the user's profile, directly above Plaintiff's plea. This escalation made clear that the harm would be preserved and amplified with corporate indifference.

50.     On April 9, 2025, Plaintiff closed his account and formally revoked consent to the Terms of Service in writing. Following that revocation, he lost all access to moderation tools and was no longer able to confirm whether the content remained online. Despite this termination, the defamatory content remained accessible, unauthenticated, and publicly searchable—causing continued reputational and psychological harm to both Plaintiff and

his child. No further communication was received from X Corp., and no resolution was offered.

51.   At no point was Plaintiff's daughter a registered user of any service operated by X Corp. She has never created an account, accepted any terms of use, or engaged in any digital relationship with the Defendant. Her image and identity were used without consent, and the Defendant's refusal to intervene after receiving actual notice resulted in lasting, compounding harm.

## V. ARBITRATION CLAUSE NON-APPLICABILITY

52.   Plaintiff's minor daughter, the subject of the defamatory post at issue, has never registered for or accessed any service operated by Defendant X Corp. She is not bound by any user agreement, has not accepted any arbitration clause, and is not subject to any Terms of Service. The harms alleged in this complaint arise not from a contractual dispute, but from the Defendant's failure to act upon actual notice of child-targeted defamation—a tortious omission with no grounding in consent.

53.   Plaintiff himself terminated his account and formally revoked his consent to the Terms of Service on April 9, 2025, after receiving no response to multiple reports. Following that revocation, he lost access to all moderation tools and was unable to determine whether the abusive content remained public. This deprivation of remedy and forced exit from public discourse occurred while the company retained full editorial control over the defamatory post.

54.   These facts render any arbitration clause unenforceable as to both plaintiffs. The child is not and never was a party to any agreement. The parent, having revoked consent and terminated the account, is no longer bound by a contract that ceased to exist at the time the relevant torts continued to unfold. To the extent Defendant seeks to compel arbitration, Plaintiff asserts that the claims at issue fall entirely outside any agreement,

and concern matters of core public interest—specifically, the failure of a billion-dollar communications entity to protect a minor after actual notice of defamation.

## VI. . NATURE OF THE CASE

55.    This case arises from Defendant X Corp.'s refusal to remove a grotesque and defamatory post targeting Plaintiff's minor daughter.

56.    The post included her image, name, and location, paired with racist and sexually explicit language.

57.    It violated the company's own stated policies regarding "targeted harassment" and "sexualization of minors."

58.    Plaintiff reported the content multiple times.

59.    X Corp. responded that the material "did not violate its policies."

60.    The content remained published, shareable, and visible—its reach multiplying across multiple profiles—leaving Plaintiff with three actionable options to protect his child:

61.    — Message the anonymous user directly. He did. The user responded by reposting the content and pinning it to the top of their profile. — Delete his verified account. He did. Silencing himself and severing public biographical links to his daughter. — File legal complaints at financial and emotional cost. He did.

62.    Only after litigation commenced did X Corp. re-engage—and even then, not to investigate, not to intervene, not to apologize or refund his money, but simply to request a direct URL. Again.

63.    In April 2025, Defendant X.AI Corp. became the controlling parent of X Corp., merging its artificial intelligence infrastructure with X.com's algorithmic editorial systems. At the time of the abuse, X.AI operated, engineered, and monetized the system that selected, ranked, and elevated the harmful post.

9

64. By selling 'amplification' tools directly to Plaintiff—while suppressing his voice and enabling defamatory content against his child—Defendants crossed the legal boundary from neutral service to active commercial publisher. This case challenges that conduct under constitutional, statutory, and common law, and is brought not only to redress private harm, but to defend the American commonwealth against the unchecked commodification of speech and the reckless endangerment of children.

## VII. CAUSE OF ACTION

### Claim I — Violation of the First Amendment: Retaliatory Suppression of Protected Speech

65. Plaintiff exercised his First Amendment rights by engaging in public-interest political speech on X.com, using his real name, identity, and image to expose and comment on coordinated inauthentic behavior on the service.

66. His posts highlighted uniform messaging across large anonymous accounts, questioned their legitimacy, and emphasized the absence of verifiable identities behind profiles with significant influence claiming to be real people with real informed opinions.

67. As a verified user and subscriber to X Premium+—a paid product that advertises "prioritized rankings in replies" and enhanced visibility—Plaintiff's credibility as a non-anonymous account, speaking publicly as both a parent and citizen, posed a challenge to the service's economic model and narrative control infrastructure.

68. Within days of subscribing to Premium+, Plaintiff experienced a sharp and measurable drop in visibility, reply impressions, and engagement. Shortly thereafter, a defamatory post targeting his minor daughter appeared and was algorithmically distributed.

69. On or about April 8, 2025, Plaintiff first reported the post using X Corp.'s internal moderation system and also via direct message to the @support account, which had been in recent contact with Plaintiff regarding a separate account billing matter—establishing X Corp.'s full awareness and operational control over the issue.

10

70. No action was taken. As the abusive post gained visibility, Plaintiff publicly replied to it, pleading for its removal. The next day, the post was pinned to the top of the anonymous user's profile alongside Plaintiff's plea—amplifying the harm and signaling the service's tacit approval.

71. Unable to remove the content, verify its deletion, or escalate through internal channels, Plaintiff deleted his account in self-protection. This deletion was not voluntary—it was coerced by X Corp.'s refusal to intervene. As a result, Plaintiff lost access to the platform's moderation tools, his digital voice, and his ability to participate in civic discourse.

72. This constitutes a retaliatory suppression of speech. The sequence of paid subscription, visibility collapse, and abuse—culminating in compelled silence—chilled Plaintiff's protected expression. The chilling effect was direct, severe, and ongoing.

73. Plaintiff asserts this claim on the theory that Defendants' conduct—when combined with federal statutory immunity and monetized suppression of dissenting speech—constitutes action under color of federal law. See Claim VII.[4]

## Claim II — Violation of the First Amendment: Algorithmic Editorialization

74. Defendants operated algorithmic and editorial infrastructure that ranked, distributed, and monetized material written by paying and non-paying membership based on engagement potential and revenue impact.

75. These systems were not neutral conduits.

76. They were commercially engineered, programmable filters that exercised specific and deliberate editorial judgment.

---

[4] Refer to *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001), which discusses the criteria for determining when a private entity is considered a state actor due to entwinement with governmental functions. (*Brentwood* held that private actors may be state actors when "entwined with governmental policies.")

77. The function of that judgment mirrored all traditional publishing apparatuses: to elevate speech that drives profit, increases readership, or serves the messaging agenda of corporate or individual interests—and, conversely, to bury dissent and suppress opposing views.

78. This process was not accidental.

79. It was designed. And it has proliferated under the legal shelter of a once well-intentioned statute—47 U.S.C. § 230—that has not been repealed but repurposed into a liability shield for monetized editorial control.

80. Section 230, like the Fairness Doctrine before it, was enacted with the goal of protecting public discourse from abuse. But where the Fairness Doctrine required balance from broadcasters, Section 230 has been repurposed to shield companies that suppress, amplify, and editorialize user speech without accountability. The harm is the same; the scale is exponentially larger. This complaint challenges the use of federal immunity to authorize corporate editorial discretion without constitutional limits.

81. Subscribers to X Premium+ (Premium Plus) were promised enhanced visibility through features such as "prioritized rankings in replies." In practice, this meant that speech from paying users was granted algorithmic preference, while disfavored content—particularly criticism of **service** leadership or disruption of anonymous influence operations—was systematically demoted or hidden.

82. These editorial decisions were made not by neutral protocol, but by human-coded systems using human decision-making skills based on corporate policy and rules designed to optimize revenue and constant use.

83. This editorial logic mirrored the decision-making of legacy publishers: content was not merely hosted—it was surfaced, ranked, and deployed based on what generated income.

84. In the case of X.com, the decline in U.S. advertising revenue has led to a business model that prioritizes direct monetization from users.

12

85.   Amplification is sold.

86.   Visibility is leased.

87.   According to X.com's own marketing materials, member payments now dictate not just user features but speech placement and publishing prominence across the service.

88.   This monetized control of speech is fundamentally incompatible with Section 230(c)(1) immunity, which applies only to passive intermediaries—not to commercial editors.[56]

89.   Defendants did not act as neutral hosts. They acted as publishers with a profit incentive.

90.   Defendants' conduct constituted algorithmic editorialization for revenue, and that editorial function actively suppressed Plaintiff's protected speech.

91.   Accordingly, Defendants are not entitled to immunity under 47 U.S.C. § 230(c)(1).[7]

**Claim III — Violation of Substantive and Procedural Due Process**

92.   Defendants enforced their service policies arbitrarily—allowing grotesque content targeting a child to remain published while silencing the Plaintiff.

93.   He was given no notice, no explanation, and no process to appeal the company's refusal to act.

94.   Defendants denied Plaintiff any opportunity to challenge their inaction or compel enforcement of their own safety standards.

95.   This opaque and discretionary system—marketed publicly as protective—operated without fairness, transparency, or accountability.

---

[5] *See also Meta Platforms, Inc.,* The corporation—a corporate name clearly chosen to reinforce the statutory fiction of neutrality under Section 230, despite engaging in identical editorial conduct. Defendant X Corp. made no such attempt to disguise its role, further underscoring its exposure as a commercial publisher.

[6] *See generally* Jack M. Balkin, Free Speech in the Algorithmic Society: Big Data, Private Governance, and New School Speech Regulation, 51 U.C. Davis L. Rev. 1149 (2018).

[7] See Anderson v. TikTok, Inc., 82 F.4th 93 (3d Cir. 2024), where the court held that TikTok's algorithmic promotion of harmful content to minors was not protected under Section 230.

96. It deprived Plaintiff of his right to seek redress, to defend his child, and to participate in a quasi-public digital square where speech visibility was sold, but safety was optional.

97. This constitutes a violation of both procedural and substantive due process.

98. A system that promotes speech for profit cannot simultaneously refuse basic fairness when that speech is weaponized against a minor.

99. Plaintiff does not assert a constitutional right to visibility, amplification, or service engagement.

100. This claim does not arise from any expectation of promotion or reach, but from the refusal of basic redress and the arbitrary denial of safety enforcement after the service was placed on notice of material harm to a child.

101. Plaintiff further asserts that this harm continued after the termination of his account and revocation of any contractual obligations.

102. The service retained, distributed, and algorithmically amplified the defamatory post, while invoking federal immunity as a shield against any responsibility.

103. This post-termination conduct occurred outside the bounds of consent or contract—and without any process by which Plaintiff could contest or prevent it.

104. This is not a Terms of Service dispute. It is a due process challenge to a system in which injury is inflicted, redress is denied, and accountability is immunized by statute.

105. This denial of remedy occurred not within a contractual framework, but after Plaintiff had revoked consent and deleted his account—rendering the continued publication and refusal to act a non-consensual, unregulated deprivation of basic redress.

106. When entities wield editorial discretion under federal protection, the denial of remedy to those harmed by that discretion raises a constitutional question of national consequence.

**Claim IV — Negligent Enforcement of Safety Policies and Gross Editorial Misconduct**

107. Defendants owed a duty of care to enforce their publicly stated policies—particularly those governing child safety.

108. Plaintiff submitted multiple detailed reports flagging the targeted use of his child's name, image, and location. These were ignored until litigation commenced. Even then, Defendants responded only to request a direct link—well after the harm had spread and the content had been shared, saved, and algorithmically amplified.

109. A reasonable content moderator or automated review system would have flagged or escalated the tweet for urgent removal. The failure to do so constitutes gross negligence.

110. Defendants' own Terms of Service acknowledge the emotional harm that can result from targeted harassment and the unauthorized use of minors' images. Yet no action was taken.

111. The corporation failed to uphold even the most basic obligations of content moderation, policy enforcement, and human decency.

112. Despite Plaintiff's revocation of consent and account deletion on April 9, 2025, Defendants failed to confirm whether the defamatory content was fully removed from their databases, public feeds, or device-level caches.

113. The lack of resolution leaves Plaintiff in a state of persistent exposure and digital vulnerability, with no way to confirm the scope of continued publication or algorithmic recirculation.

114. This constitutes ongoing negligence and a breach of Defendants' duty to prevent foreseeable harm.

115. Plaintiff reserves the right to allege a violation of 18 U.S.C. § 2258A if discovery reveals that the post qualifies under federal law governing the reporting of child exploitation material.

## Claim V — Intentional Infliction of Emotional Distress

116.    Defendants knowingly allowed: The targeted defamation and algorithmic amplification of a grotesque post about a minor (Exhibit A); Repeated safety reports to be ignored without investigation or intervention (Exhibit B); Plaintiff to be functionally coerced into deleting his account (Exhibit C), in order to protect his daughter and sever public connections between them.

117.    The emotional harm caused was both foreseeable and severe. It was not a side effect—it was a consequence of deliberate indifference, profit-driven inaction, and systemic suppression of accountability.

118.    This conduct, if proven, would constitute extreme and outrageous behavior under established common law standards.

119.    It inflicted lasting trauma not just through what was published, but through what was permitted, promoted, and refused to be removed.

120.    Plaintiff does not seek repeal or rewriting of Section 230, but a judicial determination of its boundaries when applied to monetized, discretionary content curation that no longer resembles passive hosting.


## Claim VI — Declaratory Relief: Algorithmic Systems Constitute Editorial Activity

121.    Plaintiff seeks a declaratory judgment that algorithmic amplification and monetized content ranking are editorial functions, not passive hosting mechanisms—thereby disqualifying Defendants from immunity under Section 230(c)(1).[8]

122.    This is a live controversy. Defendants continue to assert **service** immunity under Section 230, while simultaneously exercising active control over the ranking, suppression, and monetization of user speech.

---

[8] *Cf.* Stuart M. Benjamin, Algorithms and Speech, 161 U. Pa. L. Rev. 1445, 1452–58 (2013) (arguing that algorithmic outputs are not always entitled to First Amendment protection because they lack intentionality and human expression).

123. The system at issue did not merely "host" the content described in Exhibit A. It chose it, promoted it, and tracked its amplification—even as its operators refused to remove it, investigate it, or acknowledge the harm it caused.

124. The **service** continues to monitor its reach and engagement metrics while denying relief to the targeted party.

125. Plaintiff further asserts that the constitutional questions presented herein cannot be fully adjudicated in state court, where no federal claim for declaratory relief is pending.

126. The ability to rejoin public discourse on Defendants' **service** depends on a federal ruling clarifying whether algorithmic amplification and suppression constitute protected editorial discretion or actionable commercial publishing.

127. Absent this clarification, the constitutional question cannot be resolved, and Plaintiff remains functionally barred from meaningful participation in the public square.

128. Declaratory relief is necessary to clarify whether a system that curates visibility for payment—while invoking federal immunity—remains constitutionally private. When a service's editorial infrastructure is monetized, its legal status must be reevaluated.

129. X Corp. calculated visibility using ranking algorithms tied to engagement metrics, subscriber tier, and revenue potential. Premium+ users were promised enhanced exposure through features like "prioritized ranking in replies"—explicitly linking payment to amplification. Speech from paying users was elevated; dissenting, disruptive, or policy-challenging voices—including Plaintiff's—were algorithmically suppressed.

130. This structure mirrors the operations of traditional publishers.

131. Content was not simply stored or relayed—it was sorted, surfaced, and elevated based on financial value. As X Corp. shifted away from ad-based revenue, its algorithms became commercial gatekeepers, turning amplification itself into a product.

132. Accordingly, Defendants acted not as neutral intermediaries but as commercial editors engaged in discretionary speech curation for profit.

133.   Declaratory relief is necessary to determine the constitutional and statutory limits of Section 230 immunity in the context of algorithmic systems that sell visibility, suppress dissent, and editorialize at scale.[910]

**Claim VII — Declaratory Relief: Section 230 Creates State Actor Entwinement**

134.   Plaintiff seeks a declaratory judgment that when a private corporation invokes federal immunity under Section 230 while simultaneously exercising discretionary editorial control over speech, it operates under color of federal law—triggering constitutional scrutiny.

135.   This legal doctrine derives from Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288 (2001), which held that entwinement with public functions, protections, or frameworks can render a nominally private actor subject to constitutional constraints.

136.   The Court found that when private conduct is cloaked in government authority, or when a private entity performs a function traditionally reserved to the state—including suppression of public speech in a public forum—it may be treated as a state actor.[1112]

137.   Defendants may argue that their private status shields them from constitutional scrutiny under Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802 (2019). But Halleck is inapposite.

---

[9] See also Austin & Levy, id. (proposing a doctrinal framework—"speech certainty"—to determine whether algorithmic expression is constitutionally protected).

[10] See also Evelyn Douek, Governing Online Speech: From "Posts-As-Trumps" to Proportionality and Probability, 121 Colum. L. Rev. 759, 793–98 (2021) (exploring how algorithmic governance complicates First Amendment protections by blurring the line between human and machine speech)

[11] See also Austin & Levy, id. (explaining that machine learning outputs differ from traditional editorial speech and should not qualify for intermediary immunity under § 230(c)(1)).

[12] See also Evelyn Douek, Governing Online Speech: From "Posts-As-Trumps" to Proportionality and Probability, 121 Colum. L. Rev. 759, 793–98 (2021)(noting that algorithmic governance may mirror state functions by regulating speech in ways that implicate constitutional protections)

138. Unlike in Halleck, Plaintiff does not claim that Defendants created a public forum. Rather, Plaintiff alleges that Defendants exercised discretionary editorial control under the protection of federal immunity—transforming private conduct into federally insulated censorship. This federally sanctioned control, monetized through algorithmic amplification and suppression, exceeds the scope of Halleck and falls within the entwinement doctrine recognized in Brentwood.There, the Court emphasized that a private entity does not become a state actor merely by opening its platform for speech.[13]

139. In contrast, Plaintiff does not allege that X Corp. is a public forum.

140. He alleges that X Corp. acts as a commercialized, deputized censor—exercising government-like authority under the protections of federal law, performing regulatory functions at scale, and wielding federally sanctioned control over speech visibility, removal, and reach.

141. This is not passive hosting.

142. It is algorithmic gatekeeping backed by immunity and profit incentives, placing it squarely within the entwinement and function-based tests recognized in Brentwood and its progeny.

143. Here, Defendants claim immunity from civil liability under 47 U.S.C. § 230(c)(1)—a federal statutory shield originally designed to protect passive intermediaries.

144. At the same time, Defendants operate algorithmic systems that rank, suppress, and promote speech for profit, acting with the discretion, authority, and editorial influence of a modern publisher.

145. This combination—private censorship backed by federal immunity—creates a new constitutional posture.

---

[13] **See also** *Halleck*, 587 U.S. at 813–14 (distinguishing cases where private entities act "under the authority of" or perform functions "traditionally exclusively reserved to the State"); contrast *Brentwood*, 531 U.S. at 296 (entwinement may create state actor status even absent formal delegation).

146. When speech is silenced through algorithmic systems that operate under a federal grant of protection, and where no competing service offers the same reach, the distinction between public and private control breaks down.

147. The harm is not incidental. It is engineered, commercialized, and federally insulated.

148. Plaintiff therefore seeks declaratory relief clarifying that when Section 230 immunity is invoked to shield editorial conduct, it constitutes entwinement with federal power and triggers scrutiny under the First and Fourteenth Amendments of the United States Constitution.

## IX. OTHER LAWSUITS

149. Plaintiff previously filed a related civil complaint in Connecticut Superior Court: Jackson Taddeo-Waite et al. v. X Corp. et al., No. LLI-CV-25-5017245-S.

150. That case involved overlapping facts but was dismissed as to the minor plaintiff for lack of counsel. It remains pending for Plaintiff under state tort law.

## X. RELIEF REQUESTED

### A. Declaratory Relief

151. That Defendants' algorithmic systems constitute editorial activity and are therefore not entitled to immunity under 47 U.S.C. § 230(c)(1);

152. That the invocation of Section 230 immunity—when coupled with monetized editorial behavior—constitutes action under color of federal law;

153. That declaratory relief is necessary to define the constitutional and statutory limits of **service** immunity in systems where speech visibility is sold, suppressed, or curated as a commercial product.

**B. Injunctive Relief**

154. An order requiring the removal of the post described in Exhibit A (if still publicly accessible);

155. A requirement that Defendants identify, isolate, and delete all copies, derivatives, or cached versions of the post across all internal systems, external distribution points, third-party applications, and known reposting accounts;

156. A further requirement that Defendants retrieve and delete the post and all associated content (including image files, metadata, reposts, and engagement records) from the originating user's account, app environment, and any devices or cloud systems under Defendants' **service** control or influence;

157. A prohibition against publication, republication, or algorithmic amplification of materially identical content;

158. A prohibition against future retaliation for Plaintiff's protected speech.

159. Compensatory Damages: For full and fair compensation for all direct and consequential damages suffered by Plaintiff as a result of Defendants' unlawful actions and omissions as alleged herein, including but not limited to damages for severe emotional distress, psychological harm, reputational injury, economic loss, coerced silence, loss of access to paid services, and other non-economic injuries directly and proximately caused by Defendants' conduct, in an amount to be proven at trial that is fair, reasonable, and just;

160. Punitive Damages: Against each Defendant for their willful, knowing, reckless, malicious, and grossly indifferent misconduct as alleged herein, in an amount to be determined at trial that is sufficient to achieve meaningful punishment for their egregious behavior, to make an example of them, and to effectively deter Defendants and other similarly situated entities from engaging in such harmful conduct, abuse of power, and systemic disregard for safety and individual rights in the future. Plaintiff will present evidence demonstrating that a substantial award of punitive damages is necessary and

21

appropriate to achieve such punishment and deterrence, considering, among other factors, the reprehensibility and duration of Defendants' conduct, the harm inflicted, Defendants' awareness of and indifference to the risk of harm, Defendants' financial resources and profitability derived from their conduct, and the public trust implicated by their operations as global communication corporation;

161. Attorneys' Fees and Costs: Pursuant to 42 U.S.C. § 1988 and any other applicable law.

162. Any additional relief this Court deems just, proper, and necessary to redress the harms and vindicate the rights at issue.

## XI. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable under law.

## XII. EXHIBITS

163. Exhibit A: A redacted screenshot of the defamatory post targeting Plaintiff's minor daughter is lodged with the Court as Exhibit A, under seal, pursuant to Fed. R. Civ. P. 5.2(d). The underlying content contains defamatory and abusive language directed at a minor and remains unaccounted for by Defendant, despite notice and account revocation.

164. Exhibit B: Copy of Defendant's email stating the post "did not violate" service policy.

165. Exhibit C: Email from Defendant indirectly confirming Plaintiff's account deletion.

166.

## XIII. CLOSING STATEMENT

167. This case presents a simple fact pattern with far-reaching consequences.

168. A grotesque post targeting a child remained online—unremoved, unrepented—while that child's parent was silenced, algorithmically buried, and denied recourse.

169. The service that permitted this harm profited from it, refused to intervene, and now claims immunity under a statute never intended to shield commercial publishing empires.

170. The law is working—not for the citizen, not for the Constitution—but for the Goliath. No American accepts that. And the American legal system cannot allow it.

171. Plaintiff does not ask this Court to change the law. He asks only that it be applied faithfully in a context where power has outgrown the fiction of neutrality.

172. When visibility is sold, when content is ranked for profit, and when the victims of harm are dismissed as policy violations, the legal distinction between "service" and "publisher" collapses.

173. What remains is a corporate entitlement to good faith—unearned and unexamined.

174. Section 230 was written in good faith. It is now used to protect bad faith at scale.

175. This complaint does not attack the idea of the internet. It challenges the impunity that governs it.

176. Plaintiff appears pro se, but not alone. He brings this action in defense of a child, of public truth, and of the constitutional line that must not be erased through silence or delay.

177. The questions raised are not merely personal—they are civic. They concern every American who believes speech should be free, and children should be safe.

178. Plaintiff respectfully submits that these matters are of sufficient public importance to merit full adjudication—and argument in open court.

179. Plaintiff appears pro se out of necessity, not preference. The legal questions raised here—about algorithmic publishing, service immunity, and child safety—do not become less urgent because they are raised without counsel. The right to be heard in federal court must remain grounded in law and harm, not in institutional access. Plaintiff asks only that these questions be evaluated on their legal merits, in the open, where they belong.

[signature continued block on the following page]

Respectfully submitted,

Jackson Taddeo-Waite, Pro Se Plaintiff

Date: May 30th, 2025

9 Bryan Hall Plaza

Washington Depot, CT 06794

(860) 626-9603

jackson@futureinventors.org